UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TYRONE POWELL,

               Petitioner,

v.                                Case No. 3:21-cv-1119-TJC-MCR

SECRETARY, DEPARTMENT
OF CORRECTIONS, et al.,

               Respondents.

_____

## ORDER

### I. Status

Petitioner, Tyrone Powell, is proceeding on a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1; Petition) and a Motion for Stay and Abeyance (Doc. 13; Motion to Stay). Petitioner challenges a state court (Duval County) judgment of conviction for three counts of aggravated assault and one count of burglary of an occupied dwelling for which he is serving a total thirty-year sentence.[1] Petition at 1. Petitioner also seeks a stay and abeyance of this proceeding to allow him to exhaust his state

---

[1] The State charged Petitioner with armed robbery (Count One), kidnapping with a firearm (Count Two), aggravated assault (Count Three), and burglary of an occupied dwelling. Doc. 7-3 at 167. A jury found Petitioner guilty of the lesser included offenses of aggravated assault as to Counts One and Two and guilty as charged of Counts Three and Four. Doc. 7-4 at 187-92.

court remedies as to a claim predicated on <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Motion to Stay at 1-3.

Respondents filed a response to the Petition (Doc. 6; Response I) with exhibits (Doc. Nos. 7-1 through 7-86; Response I Ex. 1-86)[2] and a response to the Motion to Stay (Doc. 15; Response II), and Petitioner filed a reply to Response I (Doc. 8; Reply). Respondents concede the Petition was timely filed, *see* Response I at 9, but maintain that a stay is unwarranted because Petitioner's <u>Brady</u>/<u>Giglio</u> claim is untimely and otherwise without merit. Response II at 5-20. This case is ripe for review.[3]

## II. Motion to Stay

Petitioner requests the Court to stay this proceeding to allow him to exhaust in the state courts a <u>Brady</u>/<u>Giglio</u> claim that he did not raise in the Petition. <u>See</u> Motion to Stay at 1-3. The new ground alleges that newly

---

[2] When citing exhibits, page numbers correspond to the page numbers on the Court's electronic case management system.

[3] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is not necessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

discovered evidence, namely the sentencing transcript of Edward Williams (Williams), one of Petitioner's co-defendants, establishes that the state attorney knowingly elicited false testimony at Petitioner's trial and withheld exculpatory evidence. Id. at 24-25. According to Petitioner, Williams' sentencing transcript proves that there was a "cooperation agreement" between the State and Williams that was not disclosed to the defense and that the state attorney knowingly elicited false testimony from Williams at trial that neither the State nor anyone on behalf of the State had promised Williams anything in return for his testimony. See id. at 20-23. Respondents oppose Petitioner's request to stay, arguing, among other things, that the newly discovered evidence claim is untimely and without merit, and thus, it would be futile to stay the action so Petitioner can exhaust the claim in the state courts. Response II at 1-3, 16-19.

A "federal district court[] may not adjudicate mixed petitions for habeas corpus, that is, petitions containing both exhausted and unexhausted claims." Rhines v. Weber, 544 U.S. 269, 273 (2005) (citing Rose v. Lundy, 455 U.S. 509 (1982)). Generally, such a petition must be dismissed without prejudice to allow the petitioner "to return to state court to present the unexhausted claims to that court in the first instance." Id. (citing Lundy, 455 U.S. at 522). However, the Supreme Court has held that a district court may stay a federal habeas

corpus action based on a mixed petition to permit a petitioner to return to the state court for exhaustion purposes under certain circumstances. Id. at 276-79.

Such stay and abeyance procedure, however, is "available only in limited circumstances." Id. at 277. Specifically, "stay and abeyance is only appropriate when . . . there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, . . . the district court would abuse its discretion if it were to grant [the petitioner] a stay when his unexhausted claims are plainly meritless." Id. Finally, "if a petitioner engages in abusive litigation tactics or intentional delay, the district court should not grant him a stay at all." Id. at 278.

Liberally construing Petitioner's Motion to Stay as requesting to amend or supplement the Petition to add his unexhausted Brady/Giglio claim, the Court must determine if Petitioner is entitled to a stay under Rhines. The Court, therefore, considers the merits of Petitioner's claim.

To demonstrate a Brady violation, the petitioner must show: "(1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant incurred prejudice." Wright v. Sec'y, Fla. Dep't of Corr., 761 F.3d 1256, 1278 (11th Cir. 2014) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). "Brady's prejudice prong, also referred to as the 'materiality prong,' is met when 'there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. (quoting Kyles v. Whitley, 514 U.S. 419, 433 (1995)).

"[T]o succeed on a Giglio claim, a petitioner must prove (1) that the prosecution used or failed to correct testimony that he knew or should have known was false and (2) materiality—that there is any reasonable likelihood the false testimony could have affected the judgment." Rodriguez v. Sec'y, Fla. Dep't of Corr., 756 F.3d 1277, 1302 (11th Cir. 2014). However, a Giglio claim cannot prevail on federal habeas review if it is harmless, i.e., it did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" Id. (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

At Petitioner's trial, Williams testified in relevant part that he had pled guilty to armed robbery, kidnapping with a weapon, and burglary of an occupied dwelling, he was facing a maximum life sentence, and no one on behalf of the State, including the prosecutors or law enforcement, had promised him anything for his testimony. Doc. 7-7 at 45-46, 81-82. Williams, however, admitted that although he knew he was going to prison, he wanted to serve as little time as possible and hoped the State would reduce the charges against him or make a favorable recommendation at sentencing. Id. at 85-86.

More than a month after Petitioner's trial, Williams was sentenced. <u>See</u>
Motion to Stay at 11-17. At the sentencing hearing, the trial court asked if the
parties had a sentencing recommendation and the following colloquy occurred:

| | |
|---|---|
| [Prosecutor]: | Your Honor, the state would be recommending six years, which is a below guidelines disposition, based on the defendant's extensive cooperation in the case. I believe that the defense is in agreement to that disposition, and the state would ask, if that's agreeable with the Court, that we can go ahead and sentence him at this time. |
| The Court: | Tell me what the guidelines are. |
| [Prosecutor]: | The guidelines are 10.2 years in prison. |
| The Court: | Let me pull up Mr. Williams' case. And he cooperated against the codefendant? |
| [Prosecutor]: | Yes, Your Honor. The codefendant was tried in front of Judge Aho about three - - I guess it's about a month ago now. It is Tyrone Powell. And but for this defendant's cooperation, I do not believe the state would have been able to secure a conviction in that case. |
| The Court: | Are there any minimum mandatories? |
| [Prosecutor]: | There are not with Mr. Williams, no, Your Honor. |
| The Court: | Mr. Boston, is your client in agreement with accepting the state's recommendation or does he wish to proceed to a sentencing hearing? |
| Mr. Boston: | Your Honor, we accept the state's recommendation. I have met with my client, |

|            | both late yesterday at the jail and again this morning, to go over the recommendation, and I would believe that the Court could impose those as six years Florida state prison, credit time served on each to run concurrent. |
| --- | --- |
| The Court: | And, state, do the alleged victims wish to be heard prior to disposition? |
| [Prosecutor]: | No, Your Honor. |
|            | * * * |
| The Court: | Mr. Williams, please raise your right hand to be sworn. |
| The Clerk: | Do you solemnly swear or affirm to tell the truth, the whole truth, and nothing but the truth, so help you God? |
| [Williams]: | Yes, ma'am. |
|            | * * * |
| The Court: | You are set for a sentencing hearing today, and I scheduled that sentencing hearing at 11:30 so that you may present mitigation. Your attorney has represented to the Court that you wish to allow the Court to enter the state's recommendation of six years Florida State Prison in lieu of having your sentencing hearing. Is that your choice? |
| [Williams]: | Yes, ma'am. |
| The Court: | Are you in agreement with that sentence being imposed, or would you like the Court to listen to mitigation in your case? |
| [Williams]: | I agree. |

The Court: Based on that agreement and recommendation by the state and based on your cooperation in the trial of the codefendant, I'm going to adjudicate you guilty of all three counts to robbery, armed, kidnapping with a weapon, and burglary to [sic] a dwelling, and follow the state's recommendation and sentence you to six years. . . .

Id.

  Contrary to Petitioner's argument otherwise, nothing stated at Williams' sentencing hearing establishes that he had a "cooperation agreement" with the State before or during Petitioner's trial whereby he (Williams) had been promised a certain sentence or reduced sentence in return for his testimony. Rather, the colloquy reflects that post-trial, the State chose to recommend a below guidelines sentence because Williams had cooperated in Petitioner's prosecution. In other words, there is no indication from Williams' sentencing transcript that the State withheld exculpatory or impeachment evidence from the defense or presented false testimony or failed to correct false testimony.

  In fact, Williams admitted at trial that he hoped the State would recommend a favorable sentence or reduce his charges. Thus, the jury heard evidence from which it could conclude that Williams had a personal motivation to testify against Petitioner. As a result, even assuming Williams' sentencing transcript supported a conclusion that there was a pre-trial "cooperation agreement," a finding not made by the Court, Petitioner has not demonstrated

8

either that (1) there is a reasonable probability that, had this evidence been disclosed to the defense, the result of the trial would have been different, or (2) this purported evidence could have affected the judgment. This is particularly true given the substantial evidence, discussed below, that corroborated Williams' testimony concerning Petitioner's involvement in the offenses. For these reasons, the Court concludes that Petitioner's unexhausted "Brady/Giglio" claim is plainly meritless and staying the case would be futile.

The Court further concludes that Petitioner's Brady/Giglio claim filed under the mailbox rule on October 9, 2023, is untimely. In relevant part, 28 U.S.C. § 2244(d) provides that the one-year limitation period to file a federal habeas petitions runs from the latest of (1) the date the judgment became final on direct review, (2) "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action", or (3) "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(A)-(B), (D).

After statutorily tolling the limitation period under 28 U.S.C. § 2244(d)(2) for Petitioner's properly filed state collateral proceedings, when Petitioner filed the Petition on November 3, 2021, 298 days of the one-year limitation period to file a federal habeas action had expired. Thus, at that time,

9

67 (365 − 298 = 67) days remained, or through January 10, 2022, for Petitioner to timely add a new claim to his Petition under § 2244(d)(1)(A). Further, because Petitioner has not demonstrated either a <u>Brady</u> or <u>Giglio</u> violation, § 2244(d)(1)(B) is inapplicable. <u>See</u> <u>Johnson v. Fla. Dep't Of Corr.</u>, 513 F.3d 1328, 1331–32 (11th Cir. 2008) ("To delay the running of the statute of limitations, § 2244(d)(1)(B) requires state action that both "<u>violat[ed] . . . the Constitution or laws of the United States</u>" and "prevented [the prisoner] from filing" his federal petition."). As to § 2244(d)(1)(D), with reasonable diligence Petitioner could have discovered the facts supporting his newly discovered evidence claim, i.e., the statements made at Williams' sentencing hearing, by March 9, 2017, the date Petitioner filed his Rule 3.850 Motion. Thus, Petitioner's "<u>Brady</u>/<u>Giglio</u>" claim filed on October 9, 2023, is untimely unless it relates back to one of Petitioner's ten timely filed grounds or equitable tolling is warranted.

Federal Rule of Civil Procedure 15(c) "dictates that an amendment only relates back to the original pleading and causes an otherwise untimely claim to be considered timely when, . . . 'the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.'" <u>Farris v. United States</u>, 333 F. 3d 1211, 1215 (11th Cir. 2003) (quoting Fed. R. Civ. P. 15(c)(2)). A new claim "does not relate back 'when it asserts a new ground for relief supported by facts that differ in both time and type from those original pleading set forth.'"

10

<u>Doughten v. Sec'y, Fla. Dep't of Corr.</u>, No. 3:12-cv-288-J-32JRK, 2019 WL 1116262, at *19 (M.D. Fla. Mar. 11, 2019) (quoting <u>Mayle v. Felix</u>, 545 U.S. 644, 650 (2005)).

The Petition alleges eight claims of ineffective assistance of appellate or trial counsel (Grounds One through Seven and Ten), a double jeopardy violation (Ground Eight), and a due process violation based on insufficient evidence to support the burglary conviction (Ground Nine). Petition at 8-25. In contrast, Petitioner's newly discovered evidence ground is a claim of prosecutorial misconduct predicated on violations of <u>Brady</u> and <u>Giglio</u>. Consequently, Petitioner's new ground arose from separate conduct and different facts in both time and type than Grounds One through Ten of the Petition. <u>See</u> <u>Doughten</u>, 2019 WL 1116262, at *19 (concluding that <u>Brady</u> and <u>Giglio</u> claims did not relate back to ineffective assistance of trial counsel claims because they "differ[ed] in both time and type[.]") (internal citation marks omitted). Thus, Petitioner's new ground does not relate back to the timely filed grounds.

Finally, equitable tolling is appropriate when a petitioner demonstrates: "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." <u>Holland v. Florida</u>, 560 U.S. 631, 649 (2010) (quoting <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418 (2005)). "The diligence required for equitable tolling purposes is

11

'reasonable diligence,'. . . 'not maximum feasible diligence. . . .'" *Id.* at 653 (internal quotations and citations omitted). Petitioner has not demonstrated either an extraordinary circumstance prevented him from timely filing this claim or that he pursued his claim with due diligence. When Petitioner filed his Rule 3.850 Motion, he knew without question that Williams had received "a reduced sentence" for his testimony. See Doc. 7-21 at 10 (Rule 3.850 Motion stating that Williams received a reduced sentence for his testimony). Yet, Petitioner did not seek to obtain Williams' sentencing transcript until approximately September 23, 2022. See Motion to Stay at 1-2; see also Doc. 13-11 at 2. Petitioner fails to establish that any extraordinary circumstance prevented him from obtaining Williams' sentencing transcript before this time. Further, with reasonable diligence, Petitioner could have obtained Williams' sentencing transcript from the state court before he filed his Rule 3.850 Motion to raise his alleged Brady/Giglio claim. Thus, Petitioner's "Brady/Giglio" ground is untimely in addition to being plainly meritless. Accordingly, Petitioner's Motion to Stay is denied, and the Court proceeds to the disposition of the Petition.

## III. Governing Legal Principles

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v.

Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of

13

the claim was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United

States," or "was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1),

(2). A state court's factual findings are "presumed to be correct" unless rebutted

"by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal

citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.

15

> Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan
> v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144
> L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[4] supra, at 747–748, 111 S. Ct. 2546; Sykes,[5] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A

---

[4] Coleman v. Thompson, 501 U.S. 722 (1991).

[5] Wainwright v. Sykes, 433 U.S. 72 (1977).

> prisoner may obtain federal review of a defaulted
> claim by showing cause for the default and prejudice
> from a violation of federal law. See Coleman, 501 U.S.,
> at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be

excused under certain circumstances. Even though a claim has been

procedurally defaulted, a federal court may still consider the claim if a state

habeas petitioner can show either (1) cause for and actual prejudice from the

default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d

1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some
> objective factor external to the defense that prevented
> [him] from raising the claim and which cannot be
> fairly attributable to his own conduct." McCoy v.
> Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992)
> (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[6]
> Under the prejudice prong, [a petitioner] must show
> that "the errors at trial actually and substantially
> disadvantaged his defense so that he was denied
> fundamental fairness." Id. at 1261 (quoting Carrier,
> 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

Without a showing of cause and prejudice, a petitioner may receive

consideration on the merits of a procedurally defaulted claim if the petitioner

can establish that a fundamental miscarriage of justice, the continued

---

[6] Murray v. Carrier, 477 U.S. 478 (1986).

incarceration of one who is actually innocent, otherwise would result. The

Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that

it is more likely than not that no reasonable juror would have convicted him'

of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir.

2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be

credible,' a claim of actual innocence must be based on reliable evidence not

presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting

Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases,

allegations of actual innocence are ultimately summarily rejected. Schlup, 513

U.S. at 324.

## C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective

assistance of counsel. That right is denied when a defense counsel's

18

performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.[7]

---

[7] This two-part <u>Strickland</u> standard also governs a claim of ineffective assistance of appellate counsel. <u>Overstreet v. Warden</u>, 811 F.3d 1283, 1287 (11th Cir. 2016). "Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments. Generally, only when ignored issues

Further, "[t]he question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th

---

are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." <u>Id.</u> (internal quotations and citations omitted). To satisfy the prejudice prong, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." <u>Black v. United States</u>, 373 F.3d 1140, 1142 (11th Cir. 2004); <u>see also</u> <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264-65 (11th Cir. 2009) (prejudice results only if "the neglected claim would have a reasonable probability of success on appeal").

Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d

1300, 1309 (11th Cir. 2004).

## IV. Summary of Trial

The following summary of the trial is from Petitioner's initial brief on

direct appeal:[8]

> At trial, the state's main witnesses against Mr.
> Powell were Edward Williams and Natalie Johnson -
> Mr. Powell's alleged co-perpetrators[1] - and Steven
> Dunn - the alleged victim of the aggravated assault.
> Carl Holt, an eight-time convicted felon and the
> alleged victim of the armed robbery, kidnapping, and
> burglary, did not testify at trial.
>
> Williams and Johnson both pled guilty in
> exchange for their testimony against Mr. Powell,
> hoping their testimony would result in more lenient
> sentences. They also both admitted involvement in the
> crimes, but claimed that Mr. Powell was the
> mastermind who told them what to do. Furthermore,
> Dunn was implicated in a drug deal just days before
> the events leading up to this case.
>
> Specifically, the state's evidence established
> that several days before the commission of the charged
> crimes, Dunn attempted to buy drugs from Williams.
> Dunn told Williams he had to return to his car to get
> his money and as he did, the police showed up and
> arrested Williams's girlfriend Maggie. Mr. Powell was
> upset about the situation and the fact that he had to
> pay to bail Maggie out of jail.

---

[8]As relevant to Petitioner's grounds, the Court will include specific testimony adduced at trial in considering Petitioner's claims.

The state's theory of the case was that Mr. Powell, upset with Dunn for snitching on Williams after the drug deal, and upset with Holt for having an affair with Johnson, threatened to kill Dunn and Holt and manipulated Williams and Johnson into burglarizing Holt's home. The defense contended that Williams was behind the crime spree - that Williams was upset with Dunn for alerting the cops to the drug deal and getting his girlfriend arrested, and that he was the one who threatened Dunn and Holt and who burglarized Holt's home.

A few days after the botched drug sale, Williams, Maggie, and Mr. Powell went to Holt's home in search of cocaine. Williams bought some cocaine from Holt and got back in the car while Holt and Mr. Powell talked. Several minutes later, Holt and Mr. Powell got back in the car and Mr. Powell directed Williams to drive to Dunn's house.

When they arrived at Dunn's house, Williams initiated the violence by punching Dunn before asking him why he called the police during their drug deal a few days prior. Dunn denied calling the police. At this point, the witnesses claimed that Mr. Powell pulled out a gun and pointed it at Dunn. The witnesses alleged that Mr. Powell then made Dunn strip down to his underwear before directing him to the balcony where Mr. Powell supposedly commended Dunn for refusing to admit that he called the police. Mr. Powell then escorted Dunn back into the apartment and pointed the gun at Dunn until Dunn confessed to calling the police during the drug deal. Williams, Holt, and Mr. Powell then left Dunn's residence. Though Mr. Powell was not charged with stealing anything from Dunn, Dunn stated that Williams and Mr. Powell stole several of his belongings on their way out. The witnesses claimed that Mr. Powell had the gun pointed at Holt at this point and that he ordered Holt to get in the backseat with him while Williams drove them to the Powell residence. Holt tried to run away before

22

getting in the car, but Mr. Powell allegedly threatened to kill him if he did not get back in the car.

When they arrived at the Powell residence, Williams claimed that Mr. Powell made him tape Holt's wrists, ankles and mouth. Mr. Powell allegedly turned the gun on Holt and asked him why he was having an affair with Johnson. Mr. Powell also ordered Johnson to get out of bed and asked her about the affair as well.

After Holt and Johnson denied having an affair, Mr. Powell allegedly threatened to cut off Holt's fingers with a knife that Williams had retrieved for him. Mr. Powell told Holt that he would let him go if Holt told him where his money was. According to Williams, after Mr. Powell continued to threaten Holt, Holt finally told Mr. Powell where his money was. Williams admitted to removing Holt's keys from his pockets and both he and Johnson admitted to driving to Holt's house to retrieve the money, but they claimed they only did so because Mr. Powell told them to.

Williams and Johnson entered Holt's home using the keys Williams had taken from him and removed a box containing five-thousand dollars from his bedroom. Holt's daughter was awakened by the sounds of Williams and Johnson. Johnson comforted the girl and told her that her dad had sent them to the house. The girl never stated that she saw Mr. Powell in the home.or [sic] that Johnson said they were there because of Mr. Powell. Once Williams and Johnson returned to the Powell residence with the money, Mr. Powell drove Holt home.[2]

Officer Joseph Stronko of the Jacksonville Sheriffs [sic] Office was one of the investigating officers on this case. Stronko explained that he interviewed Dunn, Williams, and Johnson. As Stronko began testifying about what Dunn told him during their interview, defense counsel objected and argued

that the officer's testimony about what Dunn said was hearsay. At a sidebar, the state argued that admitting Dunn's statements through the officer's testimony was permissible because they were nonhearsay prior consistent statements. Though defense counsel had cross-examined Williams and Johnson about their plea deals and suggested that those deals were influencing their testimony, defense counsel engaged in no such examination of Dunn. The focus of counsel's cross-examination of Dunn was about the injuries he sustained and his failure to call the police immediately after the incident. Despite the lack of an express or implied accusation that Dunn's testimony was improperly influenced or fabricated, the court permitted the testimony over defense counsel's objection, and the officer testified that Dunn told him that Mr. Powell threatened him with a gun, that Williams hit him, and that they forced him to admit that he called the cops and botched the drug sale.

[1] Natalie Powell is also Mr. Powell's estranged wife. Her maiden name is Johnson and will be referred to as such throughout this brief in an effort to distinguish between her and Mr. Powell.

[2] The state also presented the testimony of Alexis Nicholas, Mr. Powell's stepdaughter. Though Nicholas admitted that she has spoken to her mother since her mother's arrest, she claimed that her mother did not tell her how to testify at Mr. Powell's trial. Nicholas testified that on the night in question, she saw Williams, Maggie, Mr. Powell, and an unidentified man in her living room. She explained that Mr. Powell and the unidentified man, whose wrists and ankles were taped together, were handling a dispute. She also claimed that she saw a gun in Mr. Powell's lap as the men handled the dispute.

24

Doc. 7-11 at 7-12 (internal record citations omitted).[9]

## V. Analysis

### A. Ground One

Petitioner contends appellate counsel was ineffective for failing to argue that the trial court erred by allowing his co-defendant Williams, over the defense's objection, to testify that Carl Holt (Holt), the victim who did not testify, told him (Williams) that "he was in fear for his life." Petition at 8. According to Petitioner, the admission of this testimony violated the Sixth Amendment Confrontation Clause. Id.

Respondents concede that Petitioner raised this ground in his state habeas petition and the First District Court of Appeal of Florida (First DCA) denied it without written opinion. Response I at 10-11. They contend, however, that Petitioner's claim lacks merit. Id. at 29-32.

The First DCA denied this ground per curiam without written opinion. Doc. 7-20 at 1. Assuming the First DCA denied relief for the reasons articulated by the State in its response in opposition to Petitioner's state habeas petition, see Doc. 7-19 at 1-21, the adjudication is entitled to deference under AEDPA.

---

[9] On direct appeal, the State accepted Petitioner's "statement of the case as generally supported by the record" but summarized some pertinent additional facts and noted some corrections. Doc. 7-12 at 4-14.

From the Court's review of the record, the purported hearsay statement that Holt told Williams "he was in fear for his life" is not contained in the trial transcript.[10] Nevertheless, even assuming this statement was admitted at trial, the jury heard other evidence regarding Holt's state of mind. Alyssa Mednick (Mednick), Steven Dunn's (Dunn) fiancé, testified that Holt looked really scared when they exited Dunn's apartment. Doc. 7-7 at 96-98, 104.

Further, under Florida's excited utterance exception, the trial judge overruled defense counsel's hearsay objections to Williams' testimony regarding statements that Holt made while restrained by duct tape and being threatened at gun and knife point. Id. at 66-70. Florida law permits the admission of an out-of-court "statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fla. Stat. § 90.803(2). Given the extreme and distressing circumstances Holt faced when he made the statements, namely being restrained by duct tape and threatened with being shot, having his finger cut off with a knife, and being raped, see Doc. Nos. 7-7 at 65-66, 69-70; 7-76 at 437-40, 442, the judge's ruling was not clearly

---

[10] The Court reviewed the trial transcript and did not locate the statement referenced by Petitioner in the Petition. Nevertheless, even assuming Williams testified as alleged or that Petitioner complains about other statements of Holt's that were admitted, this ground is denied for the reasons set forth above.

erroneous.[11] See State v. Jano, 524 So. 2d 660, 661 (Fla. 1988) (explaining that for an excited utterance to be admissible "(1) there must be an event startling enough to cause nervous excitement; (2) the statement must have been made before there was time to contrive or misrepresent; and (3) the statement must be made while the person is under the stress of excitement caused by the event.").

For these reasons, appellate counsel was not deficient for failing to raise a non-meritorious issue. United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) ("Appellate counsel is not ineffective for failing to raise claims 'reasonably considered to be without merit.'"). Likewise, prejudice did not

---

[11] The Court further concludes that Holt's statements were not testimonial in nature. The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Confrontation Clause bars the admission of "testimonial" hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 68 (2004). Testimonial statements include "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52 (internal quotations and citations omitted). Additionally, "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." Id. at 52.

Here, Holt's statements, made while he was bound and being threatened with physical harm, were not "testimonial" in nature. His statements were not made in response to any police interrogation or questioning or under circumstances in which Holt reasonably would have believed that his statements would later be used at trial.

result from appellate counsel's failure to argue that the trial court erred by allowing Williams to testify about the statement Holt purportedly made. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Ground One is denied.

### B. Ground Two

Petitioner asserts trial counsel rendered ineffective assistance by advising him not to testify. Petition at 9-10. According to Petitioner, despite his desire to testify, he did not do so because counsel advised him that (1) the State "would exploit the fact that drugs and alcohol were involved in the crime, as the [petitioner] was severely under the influence," and (2) the State had not met its burden of proving all the elements of the burglary offense. Id. Petitioner further contends that the reason counsel told him that the State had not proven the burglary offense was because counsel wrongly believed Petitioner could not be convicted under the principal theory since he had not been charged as a principal. Id. at 10. Petitioner maintains that but for counsel's purported advice, he would have testified that he did not instruct Johnson or Williams to enter Holt's home. Id.

28

Respondents argue that this ground is unexhausted and procedurally defaulted. Response I at 11-14. Respondents note that although Petitioner raised a similar claim in his Rule 3.850 Motion, he did not raise the exact claim as alleged in the Petition. Id. at 11-12.

In his Rule 3.850 Motion, Petitioner argued that counsel was ineffective for advising him not to testify. Doc. 7-21 at 5. Consistent with his allegations in the Petition, he asserted that the reason counsel advised him not to testify was because the State "would exploit the fact that drugs and alcohol were involved in the crime, as the [petitioner] was severely under the influence," and (2) the State had not met its burden of proving all the elements of the burglary offense. Id. Nowhere in the Rule 3.850 Motion, however, did Petitioner allege that the reason counsel told him that the State had not proven the burglary offense was because counsel incorrectly believed Petitioner could not be convicted under the principal theory since he had not been charged as a principal. See id. Rather, Petitioner argued that the reason for counsel's misadvise was because counsel was "not fully prepared to put the defendant on the witness stand and would have been forced to 'wing it' off of the cuff, as well as attempt to develop and pursue a defense strategy through the questioning of his own 'client on the fly!'" Id.

As explained by the Eleventh Circuit,

> the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief. For example, habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts.

Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1344 (11th Cir. 2004) (emphasis added). Therefore, to the extent the Petition alleges that counsel's purported deficient performance was predicated on his incorrect belief that Petitioner could not be convicted under the principal theory since he had not been charged as a principal, the Court agrees with Respondents that this portion of Ground Two is unexhausted and procedurally defaulted absent application of an exception to the procedural default bar.

Petitioner has not alleged cause and prejudice or actual innocence to overcome his procedural default of this portion of Ground Two. See Reply at 1-21. Thus, this part of Petitioner's ground is barred from review.

Alternatively, assuming Petitioner had exhausted this portion of Ground Two, Petitioner is entitled to no relief. After the State rested, defense counsel moved for a judgment of acquittal arguing that the State failed to prove the elements of the offenses because Petitioner was not charged as a principal in the information, and thus, evidence that Petitioner acted as a principal could not support convictions as to the armed robbery, kidnapping, and burglary

counts. Doc. 7-8 at 143-45, 146-48. In response, the State argued that, under Florida law, it was not required to charge in the information that Petitioner acted as a principal. Id. at 145-46, 148. The trial court denied the defense's motion for judgment of acquittal, concluding that the "State has set forth a prima facie case on all elements to all four counts. The Court is viewing the evidence in the light most favorable to the State, as the Court is required to do. . . ." Id. at 148-49. Thus, Petitioner heard that the trial court (1) rejected counsel's argument that Petitioner could not be convicted as a principal to burglary because it was not charged in the information and (2) found that the State had presented sufficient evidence to establish a prima facie case on all the elements of the burglary charge.

After denying the motion for judgment of acquittal, the trial court advised Petitioner of his right to testify and that the decision to testify or not was his alone to make, affirmed that Petitioner understood these rights, ascertained that Petitioner had sufficient time to consult with counsel, and questioned Petitioner about his decision to testify. Id. at 149-51. Petitioner, under oath, then told the trial court that it was his decision not to testify. Id. at 151. As supported by the record, when Petitioner declined to testify, he knew that the trial court had concluded, despite counsel's principal argument, that the State had presented sufficient evidence to support a prima facie case of all the elements of the burglary charge, yet he still chose not to testify. In other

words, regardless of defense counsel's purported improper advice, Petitioner knew before he chose not to testify that the trial court had rejected the argument that the State could not proceed on the principal theory as to the burglary charge. Consequently, Petitioner fails to establish that he was prejudiced by counsel's purported deficiency in allegedly telling him that the State failed to prove the elements of the burglary charge because he could not be convicted under the principal theory.

As to the portion of the claim asserted in the Petition that was raised in the state court, Respondents argue that Petitioner has not demonstrated that the state courts' denial of this ground is contrary to, or an unreasonable application of, clearly established federal law. Response I at 34-36. In denying this ground, the postconviction court determined that it was refuted by the record. Doc. 7-21 at 48. The First DCA per curiam affirmed the denial of this ground. Doc. 7-25 at 1.

> A defendant has a constitutional right to testify in his behalf. Rock v. Arkansas, 483 U.S. 44, 51-53 (1987). That right is personal and fundamental; only the defendant can waive it, not the court or trial counsel. Teague, 953 F.2d at 1532. Indeed, the defendant is the one "who above all others may be in a position to meet the prosecution's case." Ferguson v. Georgia, 365 U.S. 570, 582 (1961). Trial counsel must "advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify." McGriff v. Dep't of Corr., 338 F.3d 1231, 1237 (11th Cir. 2003) (citing Teague,

> 953 F.2d at 1533). Counsel performs deficiently when he or she fails to discharge these obligations. See id. If counsel has performed deficiently, the petitioner must further establish a reasonable probability that the outcome of the proceedings would have been different but for counsel's error. Strickland, 466 U.S. at 694.
>
> While the decision to testify is the defendant's alone, an attorney does not render ineffective assistance by strategically advising a defendant not to take the stand. "[I]f defense counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." Teague, 953 F.2d at 1533.

Roland v. Sec'y, Fla. Dep't of Corr., No. 3:18-CV-790-TJC-JBT, 2021 WL 3679107, at *10 (M.D. Fla. Aug. 19, 2021).

Per Petitioner's allegations, counsel, at least in part, advised him not to testify because in his professional opinion, "the state would exploit the fact that drugs and alcohol were involved in the crime, as [Petitioner] was severely under the influence[.]" Petition at 9. It cannot be said that no reasonably competent attorney would have advised Petitioner that he should not testify where the State would have been able to discredit Petitioner's testimony given his drug and alcohol use and resulting intoxication at the time of the offenses and likely would have elicited additional damaging testimony. See, e.g., Goff v. United States, 693 F. App'x 854 (11th Cir. 2017) (noting that "[e]ven if in retrospect a strategy taken by counsel 'appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no

competent attorney would have chosen it.'"). Petitioner, therefore, has not demonstrated deficient performance.

Further, the evidence presented at trial of Petitioner's guilt was substantial. Dunn testified that Petitioner, Williams, and Holt came to his apartment between 9:30 and 11:00 p.m. on November 27, 2011, and that Petitioner threatened him with a gun, made him strip down to his underwear, and pistol whipped him. Doc. 7-7 at 119-25. In addition, Dunn said that Petitioner, who was upset that Dunn denied calling the police, pointed the gun at Williams after which Williams hit Dunn. Id. at 122. Consistent with Dunn's testimony that effectively implied that Petitioner was calling the shots, Mednick testified that when Petitioner, Holt, and Williams left Dunn's apartment, Petitioner told Williams that he "better get [Holt]," who looked scared and was sandwiched between Petitioner and Williams. Id. at 104-05.

Among other things, Williams testified that Petitioner turned the gun on Holt at Dunn's apartment and talked to Holt about a conversation Holt previously had with Natalie Johnson (Johnson),[12] Petitioner's wife. Doc. 7-7 at 58. Williams said that when he, Holt, and Petitioner left Dunn's apartment,

---

[12] Natalie Powell testified that she was still married to Petitioner and continued to go by the last name of Powell, not Johnson. Doc. 7-76 at 399-402, 419. For consistency purposes, when referencing Natalie Powell, the Court refers to her by the name of Johnson.

Petitioner made him drive by threatening that he would "be in the same boat" as Holt if he did not do so. Id. at 60.

According to Williams, when they got to Petitioner's house, Petitioner, who still had the gun, instructed him to get duct tape and bind Holt, who was sitting on a stool in front of Petitioner. Id. at 62-64. Williams said that after Petitioner confronted Johnson and Holt about their relationship, Petitioner told Holt that he would release him if he gave him money. Id. at 65. Williams maintained that Petitioner directed him to get a knife from the kitchen and Petitioner then threatened to cut off Holt's finger and to rape him at which point Holt told him where the money was in his house. Id. at 65-66, 69-70. Williams said he got Holt's keys from his pocket per Petitioner's direction, and Petitioner directed Johnson to go with Williams to Holt's house. Id. at 70-71. Williams testified that he and Johnson drove to Holt's home, entered it using Holt's keys, and he retrieved the box of money while Johnson comforted Holt's daughter, who was upset that they were in the house. Id. at 71, 73-74. When they returned to Petitioner's and Johnson's home, according to Williams, Petitioner still had the gun, but Holt was no longer restrained, Williams gave the money to Petitioner, and Petitioner drove Holt home. Id. at 75-77.

Johnson testified that Petitioner woke her on the morning of the offenses and made her get up to discuss his belief that she and Holt were in a relationship. Johnson said that Petitioner, who was sitting across from Holt,

accused her of cheating on him with Holt. Doc. 7-76 at 404-10. Johnson and Holt denied having an affair. Id. Johnson said that during the conversation, Williams was present, and she saw him holding duct tape and a knife at some point. Id. at 409. According to Johnson, after the conversation, Petitioner ordered her to take Williams "somewhere," and she drove Williams to Holt's home, which they entered. Id. at 411-14, 428. She said that Williams had a box when they left Holt's home. Id. at 414-15.

Williams' and Johnson's testimony concerning what happened at Petitioner's home leading to the burglary, including the role Petitioner played, was corroborated by the testimony of Alxis Nicholas (Nicholas), Petitioner's stepdaughter. Nicholas, who maintained that she loves Petitioner very much, testified that around 1:00 a.m. on the morning of the offenses, she went downstairs to get a drink and to ask Petitioner to fix her broken bed. Doc. 7-76 at 431, 434-35. Nicholas said that Petitioner told her he was busy "handling business" and sent Williams upstairs to repair her bed. Id. at 435. According to Nicholas, after Williams returned downstairs, she went to the staircase to see what was happening below and saw Petitioner, Williams, Maggie Talbert (Maggie), and Holt downstairs. Id. at 436-38. Nicholas testified that Holt was bound with duct tape and Petitioner, who was seated closely in front of Holt with a gun on his lap, was talking to Holt about "cheating" and said "[d]on't make me shoot you" and that he "didn't want to do this" and at some point,

Holt said "[d]on't do it." Id. at 437-42. Nicholas further testified that Petitioner slapped Holt, that Holt asked Petitioner not to shoot him, and that she assumed Petitioner and Holt were handling a dispute. Id. at 437, 441-43.

Williams' and Johnson's testimony concerning Petitioner's actions supported a finding that he acted as a principal in the burglary offense. Specifically, their testimony demonstrated that Petitioner threatened Holt to learn where he had money, directed Williams to get Holt's keys from his pocket after learning where the money was, ordered Johnson to drive Williams to Holt's home, and then took Holt's money when Johnson and Williams returned from Holt's home. Williams' and Johnson's testimony was corroborated by Nicholas' testimony. Likewise, Williams' testimony indicating that Petitioner directed much of the criminal conduct was corroborated by Dunn and Mednick's testimony. Consequently, even assuming Petitioner had testified that he did not tell Johnson or Williams to enter Holt's home or commit the burglary, a reasonable probability does not exist that the outcome of the trial would have been different.

In sum, Petitioner has not established that counsel was deficient for advising him not to testify or that prejudice resulted from counsel's purported deficient advice. After review of the record and the applicable law, the Court concludes that the state court's adjudication of this ground was not contrary to, or an unreasonable application of, clearly established federal law. Nor was

the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Ground Two is denied.

### C. Ground Three

Petitioner alleges trial counsel was ineffective for failing to properly cross-examine Williams. Petition at 11-12. To support this ground, Petitioner argues that Williams testified at trial that he did not tell Detective Stronko anything in his first interview, but Williams actually made the following statements: (1) he never went in Holt's home, (2) he had no knowledge of any crime, (3) Petitioner would never have involved him in a crime, (4) he never spoke to Holt's daughter, (5) he never removed anything from Holt's home, (6) Johnson picked him up at a hotel and paid him to ride with her to pick up some money and dropped him off afterwards at the hotel, and (7) Johnson asked him to accompany her because Petitioner was not around. Id. According to Petitioner, counsel should have impeached Williams by introducing his first statement to Detective Stronko, which would have established that Williams initially implicated himself and Johnson and exculpated Petitioner of involvement in the offenses. Id. at 12.

As conceded by Respondents, Petitioner raised this ground in his Rule 3.850 Motion. See Doc. 7-21 at 6-7. In denying this ground, the postconviction

court determined that it was refuted by the record. Doc. 7-21 at 48. The First DCA per curiam affirmed the denial of this ground. Doc. 7-25 at 1.

The record establishes that Williams testified on cross-examination that he did not tell Detective Stronko anything in his initial interview, including that Petitioner was not involved in the offenses. Doc. 7-7 at 81, 86-87. Trial counsel, however, elicited testimony establishing that Williams initially was not forthcoming with Detective Stronko, confessed his involvement and his co-defendants' involvement in the offenses only after he had been incarcerated for two weeks, had motive to implicate Petitioner in the offenses, was never charged for his involvement in the offense against Dunn, and had tried to sell drugs prior to the offenses at issue in this case and was never charged for it. Id. at 79-90.

Moreover, Detective Stronko testified that in Williams' first interview, he initially denied any involvement in the offenses but then minimized his involvement by maintaining that he only accompanied Johnson to Holt's home. Doc. 7-8 at 120. On cross-examination, defense counsel questioned Detective Stronko further about Williams' first interview. Id. at 129-39. Detective Stronko reiterated, contrary to Williams' testimony, that Williams did speak with him, initially denied any involvement in the offenses, and later placed himself at Holt's home with Johnson for which he received proceeds. Id. at 130. Detective Stronko also indicated that Williams may have denied Petitioner's

involvement in the offenses, but he would have to review the entire interview to confirm this. Id. Detective Stronko admitted that Williams gave two different versions of the incident. Id. at 138-39.

Defense counsel thoroughly cross-examined Williams and challenged his credibility. In addition, although counsel did not impeach Williams with his specific statements in the first interview, counsel elicited testimony from Detective Stronko contradicting Williams' testimony about the first interview. In other words, ample evidence was presented to impeach Williams' credibility. Consequently, Petitioner has not demonstrated that counsel was deficient for failing to properly cross-examine Williams or that a reasonable probability exists that the outcome of the trial would have been different had counsel impeached Williams with his specific statements in the first interview with Detective Stronko.

After review of the record and the applicable law, the Court concludes that the state court's denial of this ground was not contrary to, or an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Ground Three is denied.

### D. Ground Four

Petitioner asserts counsel rendered ineffective assistance by failing to advise him regarding the principal theory. Petition at 13-14. According to Petitioner, the State approached the defense about making "an offer for resolution" and indicated that the range was three to five years because Petitioner's "scoresheet reflected that his score was within that range."[13] Id. at 13-14. Petitioner contends that had counsel properly advised him that he could be convicted for crimes his co-defendants committed, he would have made the State an offer. Id. at 13.

Petitioner raised this ground in his Rule 3.850 Motion. See Doc. 7-21 at 7-8. In denying this ground, the postconviction court determined that it was refuted by the record, incorporating the State's response to Petitioner's Rule 3.850 Motion by reference. Doc. 7-21 at 48. The First DCA per curiam affirmed the denial of this ground. Doc. 7-25 at 1.

The United States Supreme Court has long recognized that Strickland's two-part inquiry applies to ineffective-assistance-of-counsel claims arising out

---

[13] Petitioner notes that the State's "offer ranged between three (3) to five (5) years." Petition at 13. Considering Petitioner's allegations, it does not appear that the Petition alleges that the State actually made Petitioner a plea offer. Rather, the Petition seemingly alleges that the State engaged in plea discussions with the defense in which it invited the defense to make an offer to resolve the case and indicated that Petitioner's scoresheet reflected that his sentencing range was between three to five years. See id. at 13-14.

of the plea process. See Hill v. Lockhart, 474 U.S. 52, 57 (1985). In companion decisions in Missouri v. Frye, 566 U.S. 134 (2012), and Lafler v. Cooper, 566 U.S. 156 (2012), the Supreme Court clarified that the Sixth Amendment right to the effective assistance of counsel extends specifically "to the negotiation and consideration of plea offers that lapse or are rejected." In re Perez, 682 F.3d 930, 932 (11th Cir. 2012) (footnote omitted). The Court articulated a four-part test to prove prejudice in the context of a foregone guilty plea. Lafler, 566 U.S. at 164; see Frye, 566 U.S. at 147. To show prejudice, defendants must demonstrate:

> a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it. . . . To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

Frye, 566 U.S. at 147.

Here, Petitioner offers only conclusory and speculative assertions that the State would have provided him with a plea offer, or accepted a plea offer, of three to five years. "[A] defendant has no right to be offered a plea," Frye, 566 U.S. at 148, and Petitioner offers no evidence that a plea offer of three to five years would have been made or accepted by the State in this case. Petitioner's contention that the State "offered" or solicited the defense to make

an offer to resolve the case against him for three to five years is dubious, at best, considering Florida law and the record.

According to Petitioner, the State indicated that the purported "offer" was three to five years because his "scoresheet reflected that his score was within that range." Petition at 13. However, this sentencing range did not reflect Petitioner's sentencing exposure as charged. Rather, the scoresheet and sentencing range of approximately five years was calculated <u>after</u> trial based on Petitioner's convictions on the lesser included offenses of aggravated assault, not the charged offenses of armed robbery and kidnapping. <u>See</u> 7-21 at 29-30. The scoresheet reflecting this range was filed on April 10, 2015. <u>Id.</u>

As the State argued in its response to the Rule 3.850 Motion, which the postconviction court accepted by incorporation in denying this claim, Petitioner "would have scored much higher than five years if he was convicted as charged on all four counts." <u>Id.</u> at 25. Further, Petitioner faced "minimum mandatory sentences greater than ten years and could have been sentenced up to life" as charged for armed robbery and kidnapping. <u>Id.</u>

Under Florida's offense ranking chart, Petitioner's charges for armed robbery (Count One) and kidnapping with intent to commit a felony (Count Two) were level 9 offenses.[14] <u>See</u> Fla. Stat. § 921.0022(3)(i) (2011). Petitioner

---

[14] The Court notes it appears that the offense level of 9 would have been increased to level 10. <u>See</u> Fla. Stat. § 775.087(1) ("For purposes of sentencing under chapter 921

fails to refute the State's contention that, as charged, under Florida law with the kidnapping count scored as the primary offense rather than the burglary offense, and the burglary, robbery, and aggravated assault offenses scored as additional offenses, Petitioner's "total sentence points would have been 185, for a score of 117.75 and a lowest permissible prison sentence of 117.75 months (i.e., 9.8125 years)." Response I at 41. Further, as charged, the robbery and kidnapping offenses carried minimum mandatory sentences of ten years. Fla. Stat. § 775.087(2)(a)(1) (2011).

Similar to Petitioner, as discussed above in Section II, co-defendant Williams' guideline score was 10.2 years. The State recommended a below guideline sentence of <u>six</u> years as to Williams. Williams had pled guilty to three offenses – armed robbery, kidnapping, and burglary, was not facing a mandatory minimum sentence, and cooperated in Petitioner's prosecution. Further, before agreeing to the State's sentence recommendation, the judge ensured there was no mandatory minimum sentence requirement.

Given that the State recommended a sentence for Williams <u>greater</u> than the potential three-to-five-year offer alleged by Petitioner, the Court finds it

---

and determining incentive gain-time eligibility under chapter 944, a felony offense which is reclassified under this section is ranked one level above the ranking under s. 921.0022 or s. 921.0023 of the felony offense committed."). The Court, however, accepts Respondents' unrefuted representations concerning Petitioner's sentence exposure as charged in the amended information.

inconceivable that the State would have been willing to accept Petitioner's "offer" of three to five years or would have made such an offer considering the seriousness of Petitioner's charges and the evidence against him. Moreover, considering that Petitioner was charged with offenses that carried minimum mandatory sentences, he has not demonstrated a reasonable probability exists that the trial court would have accepted a plea for a three-to-five-year sentence.

In sum, Petition has failed to provide any evidence establishing that a reasonable probability exists that he and the State would have agreed on terms of a plea bargain or that the trial court would have accepted it. Thus, even assuming deficient performance by counsel, Petitioner's claim is without merit because he has not shown the Lafler/Frye resulting prejudice.

After review of the record and the applicable law, the Court concludes that the state court's adjudication of this ground was not contrary to, or an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Ground Four is denied.

### E. Ground Five

Petitioner maintains trial counsel rendered ineffective assistance by failing to object to Williams' hearsay statement concerning what Holt said. Doc. 1 at 16. Specifically, Petitioner references Williams' testimony in response

to the State's question regarding whether Holt indicated he had money for Petitioner. <u>Id.</u>

Petitioner raised this ground in his Rule 3.850 Motion. <u>See</u> Doc. 7-21 at 8-9. In denying this ground, the postconviction court determined that it was refuted by the record. <u>Id.</u> at 48. The First DCA per curiam affirmed the denial of this ground. Doc. 7-25 at 1.

At trial, Williams testified that Petitioner asked Holt if he had any money and said that if Holt did, "he'd let him go." Doc. 7-7 at 65. The prosecutor asked Williams how Holt responded. <u>Id.</u> Counsel did not object to the question, and Williams said "[a]t first [Holt] said no." <u>Id.</u> The prosecutor continued by questioning Williams about whether there were threats of violence made against Holt, and Williams affirmed that Petitioner threatened to cut off Holt's finger with a knife. <u>Id.</u> The prosecutor asked Williams if Holt made any statements after this threat. <u>Id.</u> at 66. Defense counsel objected, and the trial court sustained the objection. <u>Id.</u>

In response to the prosecutor's next question, Williams began to say that Holt kept denying he had money, and counsel again objected based on hearsay. <u>Id.</u> At this point, the trial judge held a sidebar at which the prosecutor argued that the statements were not being offered for the truth of the matter asserted and otherwise were excited utterances. <u>Id.</u> at 66-69. The judge concluded that the statements were admissible as excited utterances. <u>Id.</u> at 67-68.

46

Although counsel did not object to the State's first question about what Holt said regarding whether he had money for Petitioner, counsel did object thereafter and his objections were overruled based on Florida's excited utterance exception to hearsay. As discussed above in Ground One, the trial judge found, under Florida law, that Williams' hearsay testimony satisfied the excited utterance exception. This determination is entitled to deference and is not clearly erroneous. Moreover, even discounting Williams' hearsay testimony concerning Holt's statements, ample evidence of Petitioner's guilt was presented. Thus, a reasonable probability does not exist that but for counsel's failure to object to the one question referenced in this ground, the outcome of the trial would have been different.

After review of the record and the applicable law, the Court concludes that the state court's adjudication of this ground was not contrary to, or an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Ground Five is denied.

### F. Ground Six

Petitioner contends that counsel was ineffective for failing to object to the prosecutor's improper bolstering of Williams' testimony during closing argument. Petition at 17-18. Specifically, Petitioner complains that counsel

47

failed to object when the prosecutor argued, "He's pleading guilty to all his crimes, and yeah, he's facing prison right now. . . But he's taking responsibility for what he did." Id. at 18. Petitioner also contends that the prosecutor improperly opined that Williams "did not receive anything in return for his testimony" and that Williams was truthful. Id. According to Petitioner, the prosecutor's statements "were opinionated, vouched for the witness's testimony, and was [sic] not supported by the evidence." Id. at 17.

Petitioner raised this ground in his Rule 3.850 Motion. See Doc. 7-21 at 8-9. In denying this ground, the postconviction court determined that it was refuted by the record. Doc. 7-21 at 49. The First DCA per curiam affirmed the denial of this ground. Doc. 7-25 at 1.

The prosecutor's statements during closing argument indicating that Williams had pled guilty as charged, knew he was facing life in prison, but chose to take responsibility were predicated on Williams' testimony. See Doc. Nos. 7-7 at 45, 78, 81; 7-8 at 199; 7-9 at 23. Further, the prosecutor's argument that purportedly "opined" that Williams did not receive anything in return for his testimony was based on Williams' testimony that he had not been promised anything in return for his testimony and knew he was going to prison. See Doc. Nos. 7-7 at 85-86; 7-8 at 201. Likewise, the prosecutor's statements arguing that Williams was telling the truth were predicated on the fact that other witnesses' testimony corroborated his

48

testimony, he had pled guilty as charged, he did not deny his involvement in the offenses, and he was facing life in prison, all of which were supported by evidence presented at trial. See Doc. 7-9 at 23-24, 29-30. "[A]n attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." Miller v. State, 926 So. 2d 1243, 1254–55 (Fla. 2006) (citing Craig v. State, 510 So. 2d 857, 865 (Fla.1987)). Consequently, counsel had no reason to object to the prosecutor's statements and was not deficient.

Furthermore, considering the trial transcript on the whole, the Court concludes that even assuming any of the prosecutor's statements were improper, they did not render Petitioner's trial fundamentally unfair, or "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). Petitioner, therefore, has not demonstrated either deficient performance or that a reasonable probability exists that the outcome of the trial would have been different had counsel objected to the prosecutor's statements.

The Court concludes that the state court's denial of this ground was not contrary to, or an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Ground Six is denied.

### G. Ground Seven

Petitioner claims that the cumulative effect of his trial counsel's errors as alleged in Grounds Two through Six denied him a fair trial. Petition at 19. He raised this ground in his Rule 3.850 Motion. Doc. 7-21 at 10-11. Neither Respondents nor the postconviction court, however, addressed the ground. See Doc. 7-21 at 26-27, 49. Consequently, the Court reviews it de novo. Mason v. Allen, 605 F.3d 1114, 1119 (11th Cir. 2010) (when a claim is properly presented to the state court, which fails to adjudicate it on the merits, the federal court reviews the claim de novo).

None of Petitioner's individual grounds of ineffective assistance of trial counsel warrant relief; thus, there is nothing to accumulate. See Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012). Petitioner's trial counsel's alleged errors, neither individually nor cumulatively, deprived him of a fair trial or due process. Considering the record, the Court concludes that Petitioner is not entitled to relief on Ground Seven.

### H. Ground Eight

Petitioner alleges that the trial court violated his right against double jeopardy by terminating his first trial without his consent and discharging the jury without affording him an opportunity to appeal. Petition at 21.

Respondents argue that this ground is procedurally barred and otherwise without merit. Response I at 16-19, 47-51.

Petitioner first raised this ground in a petition for writ of certiorari, which he filed in the First DCA. Doc. 7-37 at 1-12. The First DCA treated Petitioner's filing as a petition for writ of habeas corpus and dismissed it pursuant to <u>Baker v. State</u>, 878 So. 2d 1236 (Fla. 2004). <u>See</u> Doc. 7-38 at 1-2.

Petitioner then filed a petition for writ of habeas corpus in the circuit court raising a double jeopardy claim. Doc. 7-63 at 40-49. The postconviction court determined that the claim was not properly raised in a petition for writ of habeas corpus under Florida law, construed the petition to be a Rule 3.850 motion, and concluded that Petitioner's claim was untimely and otherwise without merit. Doc. 7-53 at 5-8. The First DCA per curiam affirmed the postconviction court's denial of Petitioner's due process claim, citing <u>Baker</u> for the proposition that "[t]he remedy of habeas corpus is not available in Florida to obtain the kind of collateral postconviction relief available in the sentencing court pursuant to rule 3.850." Doc. 7-67 at 1. Thus, the First DCA affirmed the postconviction court's determination that Petitioner's claim was properly raised in a Rule 3.850 motion and affirmed the finding that Petitioner's double jeopardy claim was untimely and otherwise without merit.

In <u>Baker</u>, the Florida Supreme Court held that, with limited exceptions, habeas corpus relief is not available to obtain collateral postconviction relief

for claims that could have been brought in a Rule 3.850 motion. See Baker, 878 So. 2d at 1245-46. In dismissing Petitioner's construed petition for writ of habeas corpus, the First DCA clearly and expressly relied on a state procedural rule to dispose of the federal claims asserted in the petition. In addition, the First DCA's decision on the procedural issue rested solely on state law and was not intertwined with an interpretation of federal law. Moreover, Florida's rule prohibiting the use of a state habeas petition to directly or collaterally attack a prisoner's conviction, rather than using a direct appeal or a Rule 3.850 motion, is firmly established and consistently followed by Florida courts. See Baker, 878 So. 2d at 1245–46; see also Kennedy v. Sec'y Fla. Dep't of Corr., No. 3:16CV175/LAC/EMT, 2018 WL 912306, at *20 (N.D. Fla. Jan. 16, 2018) (concluding double jeopardy claim was procedurally barred from federal review based on First DCA's dismissal of claim under Baker).

Similarly, the postconviction court, in construing Petitioner's second petition for writ of habeas corpus to be a Rule 3.850 motion and finding it to be untimely, relied on firmly established state procedural rules to dispose of Petitioner's federal double jeopardy claim. See Baker, 878 So. 2d at 1242; see also Hall v. State, 94 So. 3d 655, 657 (Fla. 1st DCA 2012) (affirming dismissal of petition for writ of habeas corpus and noting that "'[s]imply construing an alleged error as 'manifest injustice' does not relieve [Appellant] of the time bar

52

contained in' rule 3.850."). Therefore, this ground is procedurally barred from review absent application of an exception to the procedural default bar.

Upon consideration of Petitioner's arguments, <u>see</u> Reply Doc. 8 at 1-21, the Court concludes that Petitioner has not established cause for and actual prejudice from the default or that a fundamental miscarriage of justice will result if this claim is not addressed on the merits. First, Petitioner has not shown that he could not have raised the issue on direct appeal or in a timely Rule 3.850 motion simply because the court reporter indicated that she did not find her stenographer notes for the date of the first trial.

The Florida Rules of Appellate Procedure have rules governing the appellate record and indicate that "[t]he burden to ensure that the record is prepared and transmitted in accordance with [the appellate] rules will be on the petitioner or the appellant." Fla. R. App. P. 9.200(e). Further, when a transcript is unavailable, "a party may prepare a statement of the evidence or proceedings from the best available means, including the party's recollection." Fla. R. App. P. 9.200(b)(5). Thus, Petitioner or his counsel either could have taken measures to obtain the transcript from the first trial or prepared a statement concerning what happened at the first trial if no transcript was available in accordance with Rule 9.200(e). Consequently, Petitioner has not

shown that an objective factor external to the defense prevented him from raising the claim either on direct appeal or in a timely Rule 3.850 motion.[15]

Moreover, "[a] criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." United States v. Mezzanatto, 513 U.S. 196, 201 (1995). The right against double jeopardy is among the rights a criminal defendant may waive. See Ricketts v. Adamson, 483 U.S. 1, 10 (1987) (double jeopardy defense waivable by pretrial agreement).

Here, the record establishes that Petitioner, who initially represented himself at his first trial, requested the appointment of counsel during the State's case-in-chief. See Doc. 7-37 at 210-11.  After the trial court granted Petitioner's request, appointed counsel, and gave Petitioner an opportunity to consult with counsel, the defense sought a continuance. Id. at 210-22. Before granting the defense's request for a continuance, the trial court questioned defense counsel and Petitioner about whether, among other things, Petitioner waived his right against double jeopardy. Id. at 221-22.

Defense counsel advised the court that he had discussed the right against double jeopardy with Petitioner and that the defense agreed to waive

---

[15] The Court notes that the transcript of the first trial is dated October 13, 2014, and Petitioner's direct appeal concluded in 2016. See Doc. 7-37 at 242.

any sort of double jeopardy claim. <u>Id.</u> at 221. To confirm counsel's representation, the trial court asked Petitioner if he had discussed double jeopardy with counsel. <u>Id.</u> Petitioner affirmed he had ample opportunity to discuss the matter with counsel, said that counsel answered all his questions, indicated he did not have any questions about double jeopardy that he wanted to ask the court, and said he did not wish to have additional time to speak with counsel about double jeopardy. <u>Id.</u> at 221-22. When asked if he waived his right to "any sort of double jeopardy claim," Petitioner responded that he did and further told the court that he "fully comprehended." <u>Id.</u> at 221. Thereafter, the trial court, noting that Petitioner "expressly waived any sort of double jeopardy considerations," granted the defense's request for a continuance over the State's objection in reliance on Petitioner's waiver. <u>Id.</u> at 222-33. The trial court subsequently discharged the jury. <u>Id.</u> at 235-39. Considering Petitioner's representations to the trial court, the Court concludes that he knowingly and voluntarily waived his right against double jeopardy. Thus, Petitioner has not demonstrated either cause or prejudice to overcome the procedural default of this ground, and it is barred from review.[16] Accordingly, Ground Eight is denied.

---

[16] In addition to finding this ground to be untimely, the postconviction court also determined that it was without merit because Petitioner waived his right against double jeopardy. Doc. 7-53 at 7. Assuming this ground is not procedurally barred from review, Petitioner has failed to establish that the state court's determination is

## I. Ground Nine

Petitioner asserts his right to due process was violated because his conviction for burglary of an occupied dwelling is not supported by the evidence. Petition at 23. According to Petitioner, "[t]he verdict did not support a principle [sic] theory nor was there anything found in the trial record or verdict form that affirmed that the Petitioner was found guilty under the principle [sic] theory." Id.

Respondents argue that this ground is procedurally defaulted because it was raised in a petition for writ of habeas corpus and the postconviction court denied it as incognizable in a habeas petition. Response I at 19-20. Alternatively, Respondents maintain this ground is without merit. Id. at 51-53.

Petitioner raised this ground in a petition for writ of habeas corpus in the circuit court. Doc. 7-81 at 35-46. Citing Conahan v. State, 118 So. 3d 718, 733 (Fla. 2013), the postconviction court determined that Petitioner's claim was not cognizable and otherwise concluded that it was refuted by the record. Id. at 52. The First DCA per curiam affirmed the denial of the claim. Doc. 7-84 at 1-2.

---

contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts in light of the evidence presented.

As stated in <u>Conahan</u>, "habeas petitions are not vehicles for second appeals and cannot raise issues that should have or could have been raised on direct appeal." 118 So. 3d at 733 (citing <u>Everett v. State</u>, 54 So. 3d 464, 488 (Fla. 2010) and <u>Breedlove v. Singletary</u>, 595 So. 2d 8, 10 (Fla. 1992)). Florida courts have "repeatedly held" that "claim[s] that could have and should have been raised on direct appeal" are procedurally barred. <u>Everett</u>, 54 So. 3d at 488. Likewise, Florida courts routinely hold that claims that could and should have been raised in an initial postconviction proceeding are procedurally barred when asserted in a successive postconviction proceeding. <u>Id.</u>

Florida law required Petitioner to raise this ground on direct appeal. <u>See</u> <u>Spencer v. State</u>, 842 So. 2d 52, 60 (Fla. 2003). The postconviction court applied a state procedural default principle to find this ground barred. Petitioner has not shown cause and prejudice or actual innocence to overcome his procedural default of this ground. <u>See</u> Reply at 1-21. Thus, it is barred from review.

Alternatively, if Ground Nine is not procedurally barred, Petitioner has not established that the state court's denial of this ground is contrary to, or an unreasonable application of, clearly established federal law. Nor has he shown that the state court's adjudication of the claim was an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In considering a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Johnson v. Alabama, 256 F.3d 1156, 1172 (11th Cir. 2001). Federal courts may not reweigh the evidence. Jackson, 443 U.S. at 319. Pursuant to Florida law, "if an information charges a defendant with a substantive crime, . . . and the proof establishes only that he was feloniously present, aiding, and abetting in the commission of the crime, a verdict of guilty as charged should be sustained." Watkins v. State, 826 So. 2d 471, 474 (Fla. 1st DCA 2002); see also Boston v. United States, 939 F.3d 1266, 1271 (11th Cir. 2019) ("Under the Florida statute, 'a person is a principal in the first degree whether he actually commits the crime or merely aids, abets or procures its commission,' so 'it is immaterial' which kind of liability the indictment or information alleges.").

As discussed supra in Ground Two, the State presented evidence from which the jury could find that Petitioner acted as a principal in the burglary offense. Viewing the evidence in the light most favorable to the prosecution, the Court concludes that a rational trier of fact could have found Petitioner committed the burglary of a dwelling offense. Accordingly, Ground Nine is denied.

## J. Ground Ten

Petitioner maintains counsel was ineffective for failing to object at sentencing when the prosecutor made arguments referencing the offenses of which Petitioner was acquitted. Petition at 24-25. Petitioner complains that the prosecutor improperly argued that he "was the one that had Mr. Holt **duct taped** in his house" and that his actions were those of a man who had "the intent to possibly kill people[,] threaten them, **stealing money, duct taping them.**" Id. at 25 (emphasis in original).

Respondents contend this ground is unexhausted because Petitioner did not raise it in the state court. Petitioner concedes it is unexhausted but relies on the Martinez exception to overcome the procedural default. Petition at 25.

In Martinez, the Supreme Court held a lack of counsel or having ineffective counsel during initial-review collateral proceedings "may provide cause for a procedural default in a federal habeas proceeding." 566 U.S. at 9, 14. To benefit from the exception, a petitioner must demonstrate not only that he was denied effective postconviction counsel but also that he "failed to properly raise ineffective-assistance-of-trial-counsel claims during the initial collateral proceeding," and the ineffective-assistance-of-trial-counsel claim he now wishes to raise "is a substantial one, which is to say that the . . . claim has some merit." Lambrix v. Sec'y Fla. Dept. of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017) (citing Martinez, 566 U.S. at 14).

The prosecutor's statements about which Petitioner complains relate to the offenses against Holt. Although Petitioner was acquitted of robbing and kidnapping Holt, he was convicted of two counts of aggravated assault against Holt and burglary. To convict Petitioner of aggravated assault, the jury had to find that the State proved <u>inter</u> <u>alia</u> that Petitioner "intentionally and unlawfully <u>threatened, either by word or act</u>, to do violence to Carl Holt. . . ." Doc. 7-9 at 36 (emphasis added). The evidence presented at trial supporting the aggravated assault convictions included that Holt was bound with duct tape, which constituted a threat by act. Therefore, the prosecutor's references to Petitioner duct taping people were related to charges for which he was convicted.

Likewise, as to the burglary offense, the State had to prove, among other things, that "at the time of entering the structure, Tyrone Powell had the intent to commit an offense other than burglary or trespass in that structure." <u>Id.</u> at 46. Further, the trial court instructed the jury that "[p]roof of possession by an accused of property recently stolen by means of a burglary. . . may justify a conviction of burglary. . ." <u>Id.</u> at 47. Williams testified that the purpose of the burglary was to steal Holt's money, which he gave to Petitioner. Thus, the prosecutor's statement regarding "stealing money" did not pertain to charges for which Petitioner was acquitted but related to the burglary conviction. Consequently, counsel was not deficient for failing to object to these

60

statements. Further, a reasonable probability does not exist that Petitioner would have received a lesser sentence had counsel objected to the statements. Thus, this ground is not substantial and is procedurally barred from review. Accordingly, Ground Ten is denied.

Accordingly, it is

**ORDERED**:

1. The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED with prejudice**.

2. Petitioner's Motion for Stay and Abeyance (Doc. 13) is **DENIED**.

3. The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

4. If Petitioner appeals this Order, the Court **denies** a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[17]

**DONE AND ORDERED** at Jacksonville, Florida, this 8th day of July, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

c:      Tyrone Powell
        Counsel of Record

---

[17] The Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.